# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ALLEN ETIENNE**                                                        **CIVIL ACTION**

**VERSUS**                                                                    **NO. 20-1979**

**DARRYL VANNOY, WARDEN**                                **SECTION: "M"(1)**

## REPORT AND RECOMMENDATION

Petitioner, Allen Etienne, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

On December 4, 2013, petitioner was convicted of forcible rape under Louisiana law.[1]  On February 21, 2014, he was then found to be a fourth offender and was sentenced as such to a term of life imprisonment.[2]  The Louisiana Fourth Circuit Court of Appeal affirmed that conviction and sentence on May 6, 2015.[3]  On March 14, 2016, the Louisiana Supreme Court then refused to consider his related writ application because it was not timely filed.[4]

On April 27, 2016, petitioner filed an application for post-conviction relief in the state district court.[5]  That application was denied on May 11, 2016.[6]  His related writ applications were

---

[1] State Rec., Vol. 6 of 8, transcript of December 4, 2013, p. 341; State Rec., Vol. 1 of 8, minute entry dated December 4, 2013.

[2] State Rec., Vol. 6 of 8, transcript of February 21, 2014; State Rec., Vol. 1 of 8, minute entry dated February 21, 2014.

[3] State v. Etienne, 172 So. 3d 41 (La. App. 4th Cir. 2015); State Rec., Vol. 2 of 8.

[4] State *ex rel.* Etienne v. State, 188 So. 3d 1067 (La. 2016); State Rec., Vol. 8 of 8.

[5] State Rec., Vol. 1 of 8.

[6] State Rec., Vol. 1 of 8, Judgment dated May 11, 2016; State Rec., Vol. 1 of 8, minute entry dated May 11, 2016.

denied by the Louisiana Fourth Circuit Court of Appeal on September 18, 2019,[7] and the Louisiana Supreme Court on June 12, 2020.[8]

On June 28, 2020, petitioner filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.[9] The state filed a response arguing that the application should be dismissed as untimely,[10] and petitioner filed a reply to that response.[11] For the following reasons, the Court finds that the application is indeed untimely.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a statute of limitations for petitioners seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Specifically, the AEDPA provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[7] State v. Etienne, No. 2019-K-0697 (La. App. 4th Cir. Sept. 18, 2019); State Rec., Vol. 7 of 8.
[8] State v. Etienne, 307 So. 3d 1031 (La. 2020); State Rec., Vol. 8 of 8.
[9] Rec. Doc. 4.
[10] Rec. Doc. 18.
[11] Rec. Doc. 22.

28 U.S.C. § 2244(d)(1).

In its response, the state argues that Subsection A is controlling in the instant case,[12] and

petitioner does not argue otherwise.  Regarding that subsection, the United States Fifth Circuit

Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court. Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003). **However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."** Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
>
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.  See Foreman, 383 F.3d at 338-39.  **As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.**  See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.  **Louisiana Supreme Court Rule X, § 5(a) states that an application "to review a judgment of the court of appeal either after an appeal to that court ... or after a denial of an application, shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal."**

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (emphasis added).

Here, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and

sentence on May 6, 2015.[13]  Although he later attempted to seek further direct review of that

judgment by filing a writ application with the Louisiana Supreme Court, he did so after expiration

---

[12] Rec. Doc. 18, p. 5.
[13] State v. Etienne, 172 So. 3d 41 (La. App. 4th Cir. 2015); State Rec., Vol. 2 of 8.

of the thirty-day deadline.  Therefore, the Louisiana Supreme Court refused to consider the writ application, expressly stating:  "WRIT NOT CONSIDERED.  Untimely filed pursuant to La.S.Ct. Rule X § 5.  Relator may be entitled to seek post-conviction relief pursuant to La.C.Cr.P. art. 924 et seq."[14]

Because petitioner failed to file a timely direct-review writ application with the Louisiana Supreme Court, his state criminal judgment became final for AEDPA purposes no later than **June 5, 2015**, when his thirty-day deadline for seeking such review expired.  See Butler, 533 F.3d at 317-18.  Under § 2244(d)(1)(A), his federal limitations period therefore commenced on that date and then expired one year later, unless that federal deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

The first state application petitioner filed within that one-year period was the aforementioned untimely Louisiana Supreme Court writ application.  However, because that application was seeking further **direct review**, it did not trigger statutory tolling under § 2244(d)(2).  The United States Fifth Circuit Court of Appeals has expressly and conclusively held: "Under that provision it is only state **post-conviction relief proceedings** that cause tolling." Butler, 533 F.3d at 318 (emphasis added).  Accordingly, an untimely direct-review writ application, such as the one in the instant case, does not toll the federal limitations period.  See id. at 320 ("Filings that are not part of habeas or post-conviction proceedings do not invoke Section

---

[14] State ex rel. Etienne v. State, 188 So. 3d 1067 (La. 2016); State Rec., Vol. 8 of 8.

2244(d)(2) tolling.... The only document Butler filed related to his untimely direct review application was the application itself, which is indisputably a part of his direct appeal proceedings."); <u>Johnson v. Cain</u>, Civ. Action No. 12-974, 2013 WL 5961101, at *4 (E.D. La. Nov. 7, 2013); <u>Allen v. Tanner</u>, Civ. Action Nos. 11-927 and 11-1601, 2011 WL 4344586, at *2 (E.D. La. Aug. 19, 2011), <u>adopted</u>, 2011 WL 4345081 (E.D. La. Sept. 15, 2011).

However, after three hundred twenty-six (326) days of his federal statute of limitations then elapsed untolled, petitioner finally tolled the limitations period by filing his state post-conviction application with the state district court on April 27, 2016.[15]  Despite the fact that the application was denied by the state district court on May 11, 2016,[16] a state post-conviction application nevertheless remains "pending" for tolling purposes while a petitioner continues to seek **timely** review of a denial at the higher levels of the state court system.  <u>Grillette v. Warden, Winn Correctional Center</u>, 372 F.3d 765, 769-72 (5th Cir. 2004).

Here, petitioner sought review of the post-conviction denial by filing a related writ application with the Louisiana Fourth Circuit Court of Appeal, and the state does not challenge the timeliness of that writ application.[17]  After that writ application was denied September 18, 2019,[18] petitioner then sought further review by the Louisiana Supreme Court.  However, as the state notes

---

[15] State Rec., Vol. 1 of 8.  Federal habeas courts apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." <u>Causey v. Cain</u>, 450 F.3d 601, 607 (5th Cir. 2006).  Because that date cannot be gleaned from the state court record with respect to the post-conviction application, the Court has simply used the signature date of the pleading as its filing date, in that the pleading as obviously placed in the mail no earlier than the date on which it was signed.  <u>See</u> <u>United States v. Minor</u>, 582 F. App'x 315, 316 (5th Cir. 2014); <u>Estes v. Boutté</u>, Civ. Action No. 19-2289, 2020 WL 1990823, at *2 (E.D. La. Mar. 6, 2020), <u>adopted</u>, 2020 WL 1984331 (E.D. La. Apr. 27, 2020); <u>Crochet v. Goodwin</u>, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); <u>Thornton v. Terrell</u>, Civ. Action No. 09-1631, 2009 WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009).
[16] State Rec., Vol. 1 of 8, Judgment dated May 11, 2016; State Rec., Vol. 1 of 8, minute entry dated May 11, 2016.
[17] <u>See</u> Rec. Doc. 18, p. 5.
[18] <u>State v. Etienne</u>, No. 2019-K-0697 (La. App. 4th Cir. Sept. 18, 2019); State Rec., Vol. 7 of 8.

in its response herein, that writ application was clearly **untimely**; in fact, the Louisiana Supreme Court expressly denied it on that very basis, stating: "Writ application denied. Untimely filed pursuant to La.S.Ct.R. X § 5."[19]  Therefore, the post-conviction application ceased to be pending on October 18, 2019, when petitioner's thirty-day deadline[20] for challenging the Court of Appeal's judgment expired.   See Grillette, 372 F.3d at 769-71 (a state application ceases to be pending when the time for supervisory review expires).

When the one-year federal limitations period then resumed running at that point, three hundred twenty-six (326) days had already elapsed, leaving petitioner with only (39) days remaining. Accordingly, he had only until **November 26, 2019**, either to again toll the limitations period or to file his federal application.

Petitioner had no other applications for post-conviction or other collateral review pending before the state courts at any time on or before November 26, 2019. Therefore, he clearly is not entitled to further statutory tolling.[21]

The Court next considers equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases ...." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir.

---

[19] State v. Etienne, 307 So. 3d 1031 (La. 2020); State Rec., Vol. 8 of 8.

[20] A litigant has thirty days to seek review by a Louisiana Court of Appeal. See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; see also Melancon v. Kaylo, 259 F.3d 401, 404-06 (5th Cir. 2001); Campbell v. Cain, Civ. Action No. 06-3983, 2007 WL 2363149, at *3 & n.24 (E.D. La. Aug. 15, 2007).

[21] The petitioner's only state filing during that period was his untimely writ application which was electronically filed with the Louisiana Supreme Court on November 13, 2019. See Rec. Doc. 4-9, p. 2. However, "it is abundantly clear that a federal habeas petitioner receives no tolling credit whatsoever for an untimely Louisiana Supreme Court writ application." Joseph v. Vannoy, Civ. Action No. 16-0546, 2016 WL 4433640, at *4 (E.D. La. June 10, 2016) (citing Williams v. Cain, 217 F.3d 303 (5th Cir. 2000), and other cases), adopted, 2016 WL 4419004 (E.D. La. Aug. 19, 2016).

1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances").   Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted).   A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).   In the instant case, petitioner has brought forth no evidence whatsoever demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Lastly, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by asserting a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013).   In Perkins, the United States Supreme Court held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in Schlup[ v. Delo, 513 U.S. 298 (1995) and House[ v. Bell, 547 U.S. 518 (2006)], or, as in this case, expiration of the statute of limitations." Perkins, 569 U.S. at 386.   Here, petitioner claims that he is actually innocent of the crime at issue.[22]

In assessing such a claim of actual innocence, a federal habeas court normally first examines the evidence presented at trial and on which the petitioner's conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014).

---

[22] See Rec. Doc. 22, pp. 6-7.

As noted, petitioner was convicted of forcible rape.  Under Louisiana law, that crime was

defined as:

> [a] rape committed when the anal, oral, or vaginal sexual intercourse is deemed to
> be without the lawful consent of the victim because it is committed under any one
> or more of the following circumstances:
>      (1) When the victim is prevented from resisting the act by force or threats
> of physical violence under circumstances where the victim reasonably believes that
> such resistance would not prevent the rape.
>      (2) When the victim is incapable of resisting or of understanding the nature
> of the act by reason of stupor or abnormal condition of the mind produced by a
> narcotic or anesthetic agent or other controlled dangerous substance administered
> by the offender and without the knowledge of the victim.

La. Rev. Stat. Ann. §14:42.1(A).[23]  On direct appeal, the Louisiana Fourth Circuit Court of Appeal

summarized the evidence of that crime in this case as follows:

> Officer Glen Markham testified at trial that he has been on the New Orleans
> Police Force for twenty-eight years and with the motorcycle division for twenty-
> six years.  He testified that on December 13, 2011, while he was patrolling the
> intersection near St. Bernard and N. Claiborne Avenues and working on a traffic
> citation, he was approached by K.O.  He stated that K.O. had a bloody nose and
> black and blue eyes (as if she had been beaten), and she was hysterical.  He testified
> that K.O. told him that she was raped and beaten.  He called for members of the
> Sex Crimes Unit, who came to the scene.
>      Raul Vallencillo, an Emergency Medical Technician ("EMT") for the City
> of New Orleans, testified at trial that he had been with EMT for seventeen years
> and worked for the City of New Orleans for seven years.  He stated that he is also
> a captain in the St. Bernard Fire Department.  He testified that on the night of
> December 13, 2011, he was working with his partner Dave Frissel when they
> responded to a call at the intersection of St. Bernard and N. Claiborne Avenues.  He
> testified that when he got to the scene he witnessed a woman who looked as though
> she had been beaten up, and he took a patient care report on her.  At trial, he
> described what the patient care report contained, and the report was submitted into
> evidence.  He stated that the report noted, alcohol on the patient's breath; that she
> was intoxicated; and that she was unstable and could not answer questions.  Despite
> Mr. Vallencillo's insistence, the patient did not go to the hospital with him or his
> partner that evening.
>      Detective Derrick Williams testified at trial that he worked in the NOPD
> Special Victims Section and that he had been working with the NOPD for seventeen

---

[23] Louisiana law currently refers to the crime as "second degree rape."

years. He testified that on December 13, 2011, he was notified of a female victim who was physically beaten and sexually assaulted and that she was located at the intersection of St. Bernard and N. Claiborne Avenues. He testified that he witnessed K.O. being treated by EMS when he arrived, and it was evident that she had been beaten. He stated that she was crying and afraid. Detective Williams stated that K.O. told him that she did not want to continue an investigation and that she wanted to go home. Detective Williams informed K.O. that in the event she wanted to continue the investigation, her case would remain open. He stated that First District Lieutenant Montiverde took her home.

Detective Williams testified that the investigation continued the following morning when K.O. presented to University Hospital, where she underwent a sexual assault exam. Detective Williams identified the clothing worn by K.O. the evening of the incident. Detective Williams was able to interview K.O., who stated that she remembered two perpetrators. He also stated that the night of the incident her vehicle was stolen, later recovered by her boyfriend and processed with NOPD. Detective Williams testified that it was revealed through CODIS that the DNA was that of the defendant, whom K.O. stated she did not know. Detective Williams obtained an arrest warrant for the defendant. A few days later K.O. contacted Detective Williams and was able to show him the abandoned house located at 1624 Lapeyrouse Street where she was raped.

On cross-examination, Detective Williams testified that he failed to conduct a photographic line-up because K.O. told him that she could identify "Steve" but not the other individual whom she alleged was her assailant. He also conceded that neither the defendant's fingerprints nor DNA was found at the crime scene.

Bryan Davis testified that K.O. was his fiancée, and they had been dating for four and a half years. He testified that on December 13, 2011 he was at home when the police came to his house and told him that K.O. was at the police station. He took a taxi cab to go get her. He testified that when he arrived at the police station, he saw that K.O. had been beaten. He stated that they went straight home from the police station.

Brian testified that the next morning K.O. reported the rape and the stolen vehicle to the NOPD via telephone and went to the hospital. He testified that Detective Williams took him and K.O. to the location where Detective Williams was called to the night before. Brian Davis also testified that he went in search of her stolen truck, which after nine hours of searching on foot, he found on Rampart Street. Brian Davis called Detective Williams and informed him that the truck was found. He then removed the truck from the location where he found it and returned it to K.O.

Sexual assault nurse, Casey Malbrough, testified at trial that she was employed a Tulane Lakeside Hospital and attested to her schooling, training, and previous jobs in psychology and nursing. She testified that on December 14, 2011 she was working at East Jefferson General Hospital and University Hospital, and she conducted a sexual assault examination on K.O. Ms. Malbrough authenticated for the jury photos she had taken the day of the exam.

On cross-examination Ms. Malbrough testified that K.O. told her that the man who raped her did not ejaculate; that she drove her car with the defendant in it; and that another African-American male beat and raped her.

K.O. testified to the following. She was originally from Vermont and moved to New Orleans for work. On December 2011, she was working at the Royal Sonesta Hotel as a banquet server and that on the night she was raped, she had left work at 4:30 in the afternoon and stopped in a bar, where she knew the bartender, and had two shots of Rumplemint. She stated that she met "Steve" as she left the bar, and he offered to take her "someplace cool". She allowed "Steve" to drive her car, but he punched her, drove her to an abandoned building, pulled her from the car, punched her again, and dragged her into the building. She described how she was then pushed to the floor, made to perform oral sex, and then raped from behind. She recalled being in a room that she believed to be a bathroom because it had white tile walls. However, she did not see any faces once she was pulled into the building.

K.O. testified that once she heard "Steve" leave, she put on her jeans, left her underwear and her purse because she could not find them, and ran out of the building. Once she was on the street, she began banging on car windows to get people's attention but was ignored until she flagged down a police officer, who took her to the police station where she made a statement and then her fiancé, Brian Davis, picked her up. She testified that she and Mr. Davis went home, and she did not shower or have intercourse. She testified that the next day she went to the hospital where the nurse performed a rape kit. She met with Detective Williams at her home after she left the hospital. At that time she learned that her fiancé had located her truck. A couple days later K.O., with Detective Williams, was able to locate the building where "Steve" took her.

On cross-examination, K.O. testified that she thought that there was another man other than "Steve" who assaulted her because she recalled "Steve" had a nice demeanor and voice, and once she was pulled into the building her aggressor felt large and had a deep voice and a distinct smell. She testified that she was embarrassed that she made a "stupid decision" to go with "Steve", and when she reported the incident she was not in her right mind and "dizzy and distraught."

J.M. testified on behalf of the State, pursuant to motion granted by the district court and upheld by this Court in a writ application, to admit other crimes evidence at trial, that in 2002 she was homeless and had been living at the Covenant House in New Orleans for approximately six months. She testified that on May 3, 2002 she went to a drop-in health clinic with her friend, and she took a condom from the health clinic. She then went to Armstrong Park to eat lunch. She stated that she was sitting on a bench in Armstrong Park, smoking a cigarette, when a man approached her and introduced himself as "Steve,[FN2]" whom she recognized earlier because he was talking to her friend outside the drop-in clinic. She testified that "Steve" asked her for a cigarette, she shared her cigarette with him. "Steve" showed J.M. that underneath his hoodie he had a gun, threatened her, and dragged her down the street. She testified that "Steve" stopped and talked to people sitting

on a porch, and the people he spoke with were not concerned that she was crying. "Steve" took her to an abandoned building on Esplanade and St. Claude.

> [FN2] The defendant, Allen Etienne is referenced as "Steve" throughout the witnesses' testimony.

J.M. testified that once she was in the abandoned house, "Steve" threated to hit her with a brick if she did not cooperate. After removing the condom that she had placed in her bra earlier that day, "Steve" proceeded to rape her from behind. Once "Steve" was done raping J.M., he apologized to her, explained that he was on drugs, and walked her back to the Covenant House, where she called the police. She testified that she identified "Steve" to the police because he was in the bar across the street after the incident. She testified that a rape kit was performed on her in the hospital. J.M. identified the defendant sitting in the court room as "Steve". She stated that she did not have consensual sex with the defendant.

Dr. Richard Richoux testified that he is a Board Certified Psychiatrist who specializes in forensic psychiatry. He stated that the defendant was competent to stand trial.

At trial, Erica Sparacino testified that she works with the Louisiana State Police, and she oversees forensic DNA scientists. She described CODIS to the jury. She stated that the rape kit taken on K.O. at the hospital revealed the defendant's DNA on a swab taken from K.O.'s vagina.[24]

Therefore, ample evidence of petitioner's guilt was introduced at trial, and so he faces a substantial challenge to establish a viable "actual innocence" claim. To do so, he must present the Court with new evidence of his innocence – and that new evidence must be particularly compelling. Indeed, the United States Fifth Circuit Court of Appeals has explained:

> This exception's demanding standard requires evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error. The standard is seldom met.
>
> An actual-innocence claim is only established when it is shown that, in the light of newly-discovered evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. Therefore, a credible claim must be supported by new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Actual innocence is then demonstrated only when the court scrutinizes the likely impact on reasonable jurors

---

[24] State v. Etienne, 172 So. 3d 41, 47-50 (La. App. 4th Cir. 2015); State Rec., Vol. 2 of 8.

of the overall, newly supplemented record to conclude that, in the light of all evidence – both the evidence presented at trial and that newly discovered – no juror, acting reasonably, would have voted to find petitioner guilty beyond a reasonable doubt.

Floyd v. Vannoy, 894 F.3d 143, 154-55 (5th Cir. 2018) (citations, quotation marks, and brackets omitted).  "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  Schlup, 513 U.S. at 324.

Here, although petitioner contends that he is innocent, he has presented **no new evidence whatsoever** in support of that contention.  Accordingly, he has not met "the threshold requirement" for Perkins to apply.  Perkins, 569 U.S. at 386.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **November 26, 2019**, in order to be timely.  Because his application was filed no earlier than **June 28, 2020**,[25] it was untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that federal application for habeas corpus relief filed by Allen Etienne be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

---

[25] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  Both petitioner's supporting memorandum and the cover letter included with his federal application were dated June 28, 2020.  Rec. Docs. 4-11, p. 47, and 4-12, p. 11.  Accordingly, that it is the earliest date he could have delivered his application to prison officials for forwarding to this Court.

the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

      New Orleans, Louisiana, this <u>  12th  </u> day of November, 2021.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**